LANCER CLOTHING CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lancer Clothing Corp. v. Commissioner
Docket No. 7517-72.
United States Tax Court
T.C. Memo 1975-180; 1975 Tax Ct. Memo LEXIS 193; 34 T.C.M. (CCH) 776; T.C.M. (RIA) 750180; June 9, 1975, Filed Isidore Feldman, for the petitioner. E. Noel Harwerth, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioner's Federal income tax for its fiscal year ended August 31, 1967, in the amount of $19,768.58 and an addition to tax under section 6651(a), I.R.C. 1954, [1] in the amount of $4,760.42. The issues for decision are (1) whether the issuance by petitioner of its unsecured promissory notes to an employee pension trust and *197 to an employee retirement trust constitutes the payment required by section 404 so as to entitle petitioner to deductions in the face amount of the notes for the taxable year of issuance; and (2) whether petitioner failed to timely file its corporate income tax return for its fiscal year ended August 31, 1967, and, if so, was the failure due to reasonable cause. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Lancer Clothing Corporation (petitioner) which was organized in September 1966 under the laws of the State of New York maintained its principal office in Garnerville, New York at the time its petition in this case was filed. Its U.S. Corporation Income Tax Return for its fiscal year ended August 31, 1967, was filed with the district director of internal revenue, Manhattan district, New York. The first page of the return is stamped "Received Jan. 14, 1969, Int. Rev. Serv., Manhattan, N.Y." Petitioner keeps its books and reports its income on an accrual basis. Its corporate stock is owned 50 percent by Carl Thier, who is its president, and 50 percent *198 by Martin Wolk, who is its secretary. On January 1, 1967, the board of directors of petitioner adopted a Pension Trust Agreement and a Retirement Trust Agreement for the benefit of its employees. Both agreements provided for Carl Thier and Martin Wolk to be the trustees of the trusts. On August 29, 1967, petitioner issued a check for $100 to the Pension Trust and a check for $100 to the Retirement Trust. In the minutes of a special meeting of the board of directors of petitioner held on August 15, 1967, the following appeared: The President advised the meeting that it was necessary for the corporation to pass on the authorization of contributions to the Lancer Pension Trust and the Lancer Clothing Corp. Profit Sharing Plan. Mr. Feldman advised the body that in view of the fact that the corporation was presently producing the government contract, it would need all of its available cash and suggested that any contribution to the Pension Trust and Profit Sharing Plan be accomplished by promissory note so that the corporation would not undergo a cash flow problem. Upon motion duly made, seconded and unanimously carried, it was RESOLVED that the corporation make a maximum 15% contribution *199 to the Profit Sharing Plan and that the corporation make a maximum contribution authorized under the 1954 Internal Revenue Service [sic] as amended, and that such contributions be made by promissory notes. On October 1, 1967, petitioner executed a note to the Lancer Pension Trust for the sum of $15,891.30 with interest at a rate of 6 percent payable on October 20, 1969, at Rockland National Bank. The note was signed by Martin Wolk as secretary and Carl W. Thier as president of petitioner, but the payment of the note was not personally guaranteed by either of them and the note was unsecured. On October 1, 1967, petitioner executed a note to the Lancer Retirement Trust for a sum of $23,886.96 with interest at the rate of 6 percent payable on October 20, 1969. The note was signed by Martin Wolk as secretary and Carl W. Thier as president of petitioner, but was not personally guaranteed by either of them and was not secured. The note was payable at Rockland National Bank. The notes were delivered to the trustees of the pension and retirement plans before November 15, 1967. On October 21, 1969, the promissory note of $15,891.30 to the Lancer Pension Trust was paid, together with *200 interest of $1,959.21, making a total payment of $17,850.51. Also on October 21, 1969, the promissory note for $23,886.96 to the Lancer Retirement Trust was paid, together with interest of $2,944.97, making a total payment of $26,831.93. Petitioner's primary business is the manufacture of military apparel for the United States Government under contract. On November 15, 1967, petitioner filed with respondent an application for automatic extension of time to file its corporate income tax return for its fiscal year ended August 31, 1967, and with this application forwarded a check for $10,000 as the estimated amount of tax which it would owe for that fiscal year. This check was recorded on the records of the Internal Revenue Service under date of November 20, 1967, as payment of tax by petitioner for its fiscal year ended August 31, 1967. Petitioner later filed a further application for extension of time for filing its return which was shown by respondent on his records as having been received on December 22, 1967. Petitioner had its return for the year 1967 prepared by a firm of certified public accountants. The accountant assigned by the firm to prepare petitioner's return completed *201 preparation of that return and on March 25, 1968, forwarded the return to petitioner with an instruction sheet as to the signing and filing of the return. He kept a copy of the return in the files of the accounting office. Shortly after receiving the form as prepared by the accountant, petitioner's president, Carl Thier, signed the return and gave it to his secretary to be mailed. The customary procedure in petitioner's executive office was that the secretary deposited the day's mail in a postal box shortly before she left work for the day. The return as prepared by the accountant and as signed by petitioner's president showed a total tax due of $9,273.08. Under date of April 12, 1968, a computer-type notice that petitioner's return was delinquent was sent to petitioner and this notice was forwarded by petitioner to its accountant. Under date of June 7, 1968, another computer-type delinquency notice was sent to petitioner and forwarded by petitioner to its accountant. On August 9, 1968, a delinquency investigation with respect to petitioner's return for the fiscal year ended August 31, 1967, was begun. Thereafter, the accountant was informed by petitioner that the Internal Revenue *202 office in Manhattan did not have a copy of petitioner's Form 1120 for the year ended August 31, 1967. The accountant was furnished with a name and telephone number of an individual employed by the Internal Revenue Service. The accountant telephoned the employee of the Internal Revenue Service and was informed that the Service did not have petitioner's original income tax return for its fiscal year ended August 31, 1967. The Service employee requested petitioner's accountant to furnish him with a copy of petitioner's return for its fiscal year ended August 31, 1967. Petitioner's accountant mailed to the Internal Revenue Service at 120 Church Street, New York, New York a copy of the retained copy the accounting firm had of petitioner's return after having marked across the top of the copy "duplicate copy." It was this document so furnished by the accountant to the Internal Revenue Service which was stamped as filed January 14, 1969, and which was shown by respondent's records to be the return filed by petitioner on January 14, 1969. Sometime after this copy of the retained copy of the return prepared for petitioner by its accountant was furnished to the Internal Revenue Service, a revenue *203 agent presented it to petitioner for signature and it was signed by Martin Wolk as secretary-treasurer of petitioner. On February 14, 1969, a refund of $762.92, the excess of $10,000 over the tax as shown on the return, was made to petitioner. Petitioner on its income tax return for its fiscal year ended August 31, 1967, deducted $39,978.26 as payments to "Pension, profit-sharing, stock bonus, annuity plans." Respondent in his notice of deficiency disallowed all except $200 of this claimed deduction with the following explanation: It is determined that deductions for contributions to pension and retirement trusts, aggregating $39,778.26 are not allowable. The contributions were made by promissory notes which were not redeemed until 1969 and do not constitute "payment" within the purview of section 404, Internal Revenue Code. In his notice of deficiency respondent explained his determination of an addition to tax under section 6651(a) as follows: Since your income tax return for the taxable year ended August 31, 1967 was not filed within the time prescribed by law and you have not shown that failure to file your return on time was due to reasonable cause, *204 25% of the tax is added as provided by section 6651(a) of the Internal Revenue Code. OPINION Section 404(a) provides that if contributions are paid by an employer to a stock bonus, pension, profitsharing, or annuity plan, such contributions shall not be deductible under section 162 or section 212; but if they satisfy the conditions of either of those sections, shall be deductible under section 404(a) in the taxable year "when paid, if the contributions are paid into a pension trust" which is exempt under section 501(a), and in the taxable year "when paid, if the contributions are paid into a stock bonus or profit-sharing trust" exempt under section 501(a). [2]
*205 Section 1.404(a)-1(c), Income Tax Regs., states that "Deductions under section 404(a) are generally allowable only for the year in which the contribution * * * is paid, regardless of the fact that the taxpayer may make his returns on the accrual method of accounting." [3] The regulation then refers to the exception provided for a taxpayer on the accrual method of accounting to make payment not later than the time prescribed by law for filing a return for the taxable year of accrual. *206 The facts in this case show that prior to the due date of its return for its fiscal year ended August 31, 1967, petitioner executed a note to the Lancer Pension Trust and also executed a note to the Lancer Retirement Trust, and that each of these notes was delivered to the trustees of the trust to which the note was payable prior to the due date of petitioner's return for its fiscal year 1967. The record also shows that the trustees of each of these trusts were the stockholders and the two chief officers of petitioner. The record further shows that the notes were unsecured and were not personally guaranteed by either of the stockholders of petitioner. It is petitioner's position in this case that delivery of these notes to the respective trusts constituted payment of the contribution to the trust within the meaning of section 404(a). Petitioner relies on Wasatch Chemical Company v. Commissioner,313 F. 2d 843 (10th Cir. 1963), reversing 37 T.C. 817 (1962); Time Oil Company v. Commissioner,258 F. 2d 237 (9th Cir. 1958), reversing 26 T.C. 1061 (1956); and Sachs v. Commissioner,208 F. 2d 313 (3rd Cir. 1953), *207 reversing Slaymaker Lock Co.,18 T.C. 1001 (1952). Petitioner states that in Colorado National Bank of Denver,30 T.C. 933 (1958), we held that real property having a fair market value in excess of the amount claimed to be deductible as a contribution to an employees' pension trust, transferred to the trustees of that trust, was a payment to the pension trust in the year the property was transferred. Petitioner further states that in the Colorado National Bank case we recognized that it is not necessary that a payment be in cash and that a debt can be paid in property if the debtor is willing to accept the property in payment, and concludes that there is no reason why a deductible contribution to a pension trust could not be made in property. Petitioner takes the position that the promissory notes it gave to the trustees of the pension and profit-sharing trusts were property just as the real property transferred in the Colorado National Bank case was property and for this reason should constitute payment when the notes were delivered. Respondent distinguishes between a transfer of property such as was made in the Colorado National Bank *208 case and the delivery of unsecured notes to a pension trust, relying primarily on our recent case of Don E. Williams Co.,62 T.C. 166 (1974), on appeal (7th Cir., Aug. 12, 1974). Petitioner recognizes that the Williams case is not distinguishable from the instant case but argues that we should reconsider the issue and adopt the position stated in two dissenting opinions in that case. In Don E. Williams Co.,supra, we pointed out that initially in Logan Engineering Co.,12 T.C. 860 (1949), a Court reviewed case, we held that a solvent taxpayer on an accrual basis of accounting which issued and delivered its promissory notes having a value of their face amount to a profit-sharing trust for the benefit of its employees was not entitled to a deduction for the contribution under the predecessor of section 404(a) of the Code in the year the notes were delivered and that thereafter we followed the holding in the Logan Engineering Co. case in the three cases, the reversals of which by the courts of appeals are relied on by petitioner *209 in this case. We pointed out in Don E. Williams Co.,supra, that in Sachs v. Commissioner,supra, the Third Circuit relied primarily on Anthony P. Miller, Inc. v. Commissioner,164 F. 2d 268 (3rd Cir. 1947), reversing in part 7 T.C. 729 (1946). The Miller case involved whether under the predecessor of section 267 a deduction for salary accrued to the taxpayer's president who was its major stockholder should be disallowed where a note in the amount of such accrued salary was delivered to the corporate officer within the time specified by statute for payment to be made in order for such an expense payable to a related taxpayer to be deductible. As we pointed out in Don E. Williams Co.,supra, different criteria govern deductions under section 267 and deductible contributions under section 404(a). In the Williams case (62 T.C. at 169-170), we also pointed out that we disagreed with the suggestion in the Sachs case that "there is little difference between a demand promissory note and a check drawn on a bank account," and further pointed out that in our view by giving a promissory note to the *210 pension trust, the maker of that note had not transferred "property" to the trust, noting that "a promissory note in the hands of the obligor is not property of the obligor for the purposes of section 404(a)." (62 T.C. at 171) In arguing that we should reconsider the position we took in the Williams case, petitioner not only questions our analysis of the reversals of three of our cases by the courts of appeals, but also contends that there is no merit to the further grounds which we set forth in the Williams case to support our reason for not following the reversals by the courts of appeals of the Sachs,Time Oil, and Wasatch Chemical Co. cases. Petitioner points out that section 3-802 of the U.C.C. which was set forth in the Williams case as having been adopted by Illinois, the state in which the transaction in the Williams case occurred, has also been adopted by the State of New York and argues that the provisions of that section [4] were included in the U.C.C. primarily to make it clear that on a dishonor of a negotiable instrument, an action may be maintained either on the instrument or the underlying obligation. *211 In our view, regardless of the reason for its enactment, the section makes it clear that a negotiable instrument, other than one in the nature of a bank draft, merely suspends the underlying obligation until the instrument is paid. It would follow that a promissory note not payable until a stated period or until demand is made on the maker for payment, is not a "payment" of the underlying obligation upon delivery of the promissory note. We likewise do not agree with petitioner's criticism of our reference in the Williams case to the legislation which was under consideration as an amendment to section 503(b) of the Code at the time of our decision in that case. It should be noted that no deduction is allowable under section 404(a) to a pension or profit-sharing plan unless such plan is exempt under section 501(a), and that the provisions of section 503(a), prior to amendment by Pub. L. 93-406, effective January 1, 1975, provided for denial of exemption under section 501(a) to "an organization *212 described in section 401(a) * * * if it has engaged in a prohibited transaction after March 1, 1954." [5]
Section 503(b) describes prohibited transactions to include any transaction in which an organization as set forth in section 503(a) "lends any part of its income or corpus, without the receipt of adequate security and a reasonable rate of interest to * * * the creator of the organization (if a trust)." Respondent's regulations, section 1.503(c)-1(b)(1), [6] specifically *213 provides that in defining adequate security, a "borrower's evidence of indebtedness, irrespective of its name, is itself not security for a loan, whether or not it was issued directly to the exempt organization." This section makes it clear that in order for a debt to be secured within the meaning of section 503(b)(1), collateral which may be sold or foreclosed upon may be the security for the instrument or it may be guaranteed by an accommodation endorsement of those financially capable of meeting the indebtedness. It would appear that if petitioner's argument were followed and the notes given by petitioner to the trustees of the pension and retirement trusts were to be viewed as property transferred to the trusts in payment of contributions to them, it would then follow that by holding the notes, the trusts would have lent part of their corpus to their creator. In this case, the loan would be without adequate security as required by the statute. If we accept petitioner's view of payment by the issuance of notes, it would follow that the pension and retirement trusts would under the provisions of section 503(a) be subject to being denied exemption under section 501(a) because of engaging *214 in a prohibited transaction, and the contributions would not be deductible by petitioner because of failing to meet the requirements of section 404(a)(1) that the pension and retirement trusts be exempt under section 501(a). [7]
*215 We are not suggesting that the notes given by petitioner in this case to the pension and retirement plans should be considered as payment with the corpus loaned back to petitioner, but merely point out a possible result of considering the notes as payment in property, as petitioner contends we should. Section 503(b) in our view is a further indication that it was not the Congressional intent that the issuance of an unsecured note should be considered payment under section 404(a). The legislative history of section 503(b) as amended by Pub. L. 93-406 specifically stating that "the committee intends that it would be a prohibited transaction (in effect, a loan by the trust to the employer) if the employer funds his contributions to the trust with his own debt obligations," in S. Rept. No. 93-383, 93d Cong., 1st Sess., p 98 (1973), which we quoted in the Don E. Williams Co. case (62 T.C. at 171) further shows the Congressional intent that a payment under section 404(a) may not be made by an unsecured note. Relying on our holding in Don E. Williams Co., supra, *216 as well as for the reasons set forth herein, we sustain respondent's disallowance of petitioner's claimed deductions for contributions to the pension and retirement trusts in its fiscal year ended August 31, 1967. The final issue in this case is whether petitioner timely filed its corporate income tax return for its fiscal year ended August 31, 1967, and if it did not whether its failure to timely file the tax return was due to reasonable cause. Under the facts we have set forth herein, there is no basis for concluding that petitioner actually timely filed its income tax return for its fiscal year 1967. The record does show that petitioner filed for an automatic 3-month extension on the due date of its fiscal year 1967 return, November 15, 1967. The 3-month extension would mean that petitioner's 1967 return was due to be filed on February 15, 1968. The record shows that petitioner filed a further application for extension of time for filing its return, which respondent's records show was received on December 22, 1967. There is nothing in the record to indicate the further time requested by petitioner in this second request for extension or what action, if any, was taken by respondent *217 with respect to granting an extension past the 3-month automatic extension which petitioner requested on November 15, 1967. Section 6081(a) provides for the granting of extension of time for filing a return, and section 6081(b) provides for an automatic extension for corporation income tax returns for 3 months when the proper form requesting such extension is filed. [8] There is no provision for any further automatic extension, and there is nothing in this record to indicate that any further extension was granted to petitioner for filing its return. There is nothing in this record to show that on March 25, 1968, when the record indicates petitioner's accountant mailed a Form 1120 to petitioner, the time for filing the return had not run. The evidence shows that shortly after receiving the Form 1120, petitioner's president signed the return and gave it to his secretary to be mailed. The secretary was not a witness in the case and no reason was shown why she was not called as a witness. Therefore, there is no evidence in this record to show that the return signed by petitioner's president was *218 actually mailed, or if it were ever mailed, when it was mailed. Under these circumstances there is no basis for a conclusion that petitioner actually timely filed its corporation income tax return for its fiscal year 1967. *219 We turn now to whether petitioner has shown reasonable cause for failure to timely file its return. The burden is, of course, on petitioner to show reasonable cause for failure to timely file its return. The record here shows that petitioner received a delinquency notice from respondent dated April 12, 1968. If, in fact, at the time petitioner's president signed the return and gave it to his secretary to be mailed he was of the opinion that the return, if then mailed, would be timely filed, it would appear that this delinquency notice came either before the return was due under some second extension, which the record does not show was received, or shortly after the expiration of that time. All the record shows with respect to this delinquency notice, as well as a second delinquency notice mailed to petitioner under date of June 7, 1968, is that petitioner forwarded the notices to its accountant. The responsibility for seeing that the return was timely filed was on petitioner. Its officers are intelligent men and certainly understood the import of the delinquency notices. At a minimum, *220 it would appear that they should have discussed the delinquency notices with their accountant. Of course, the return prepared by petitioner's accountant for petitioner and ultimately, in January of 1969, filed by petitioner, showed that the $10,000 which had been paid with the application for automatic extension was in excess of the tax due by petitioner as shown on its return as filed. However, the fact that petitioner's officers believed that no further payment was due is no excuse for failure to timely file its return since ignorance of the law, if petitioner's officers were ignorant of the law, is not reasonable cause for failure to timely file within the meaning of section 6651(a). Samuel Goldwyn Inc., Ltd.,43 B.T.A. 1086, 1089 (1941). The only explanation given by petitioner's accountant of why he did not investigate the delinquency notices to determine if in fact petitioner had filed the return timely was to the general effect that you can't talk to a computer. Even if petitioner would have been justified in relying on its accountant to see that its return was timely filed, which we do not consider it was under the circumstances of this case, the accountant's *221 explanation totally fails to amount to reasonable cause for failure to timely file. Even though the notices were computer notices, the information contained in the notices should have been taken up with the proper individuals in the Manhattan office of the Internal Revenue Service. If, as petitioner contends, it had an additional 90 days' extension from February 15, 1968, granted under its second request for an extension of time to file its return, which is not supported by the record, a return filed promptly after receipt of the April 12, 1968 delinquency notice would have been timely. If such were the fact, it is difficult to understand why petitioner did not promptly reply to the delinquency notice and if necessary file a return in answer to that notice. On the basis of this record, we sustain respondent's determination of addition to petitioner's tax under section 6651(a) for failure to timely file its return. Decision will be entered for the respondent.
Footnotes
1. All references are to the Internal Revenue Code of 1954, unless otherwise stated.↩
2. Sec. 404(a)(1) Pension trusts.--In the taxable year when paid, if the contributions are paid into a pension trust, and if such taxable year ends within or with a taxable year of the trust for which the trust is exempt under section 501(a), in an amount determined as follows: * * * * *
(3) Stock bonus and profit-sharing trusts.-- (A) Limits on deductible contributions.--In the taxable year when paid, if the contributions are paid into a stock bonus or profit-sharing trust, and if such taxable year ends within or with a taxable year of the trust with respect to which the trust is exempt under section 501(a)↩, in an amount not in excess of 15 percent of the compensation otherwise paid or accrued during the taxable year to all employees under the stock bonus or profit-sharing plan. * * *
3. Sec. 1.404(a)-1(c) [Income Tax Regs.] Deductions under section 404(a) are generally allowable only for the year in which the contribution or compensation is paid, regardless of the fact that the taxpayer may make his returns on the accrual method of accounting. Exceptions are made in the case of overpayments as provided in paragraphs (1), (3), and (7) of section 404(a), and, as provided by section 404(a)(6)↩, in the case of payments made by a taxpayer on the accrual method of accounting not later than the time prescribed by law for filing the return for the taxable year of accrual (including extensions thereof). This latter provision is intended to permit a taxpayer on the accrual method to deduct such accrued contribution or compensation in the year of accrual, provided payment is actually made not later than the time prescribed by law for filing the return for the taxable year of accrual (including extensions thereof), but this provision is not applicable unless, during the taxable year on account of which the contribution is made, the taxpayer incurs a liability to make the contribution, the amount of which is accruable under section 461 for such taxable year. See section 461 and the regulations thereunder. There is another exception in the case of certain taxpayers who are required to make additional contributions as a result of the Act of June 15, 1955 (Public Law 74, 84th Cong., 69 Stat. 134), and the regulations thereunder. [Reg. section 1.404(a)-1.]
4. Sec. 3-802 [U.C.C.] Effect of Instrument on Obligation for Which It Is Given (1) Unless otherwise agreed where an instrument is taken for an underlying obligation (a) the obligation is pro tanto discharged if a bank is drawer, maker or acceptor of the instrument and there is no recourse on the instrument against the underlying obligor; and (b) in any other case the obligation is suspended pro tanto until the instrument is due or if it is payable on demand until its presentment. If the instrument is dishonored action may be maintained on either the instrument or the obligation; discharge of the underlying obligor on the instrument also discharges him on the obligation. (2) The taking in good faith of a check which is not postdated does not of itself so extend the time on the original obligation as to discharge a surety.↩
5. SEC. 503 [I.R.C. 1954] REQUIREMENTS FOR EXEMPTION. (a) Denial of Exemption to Organizations Engaged in Prohibited Transactions.-- (1) General rule.--An organization described in section 501(c)(3) or (17) which is subject to the provisions of this section shall not be exempt from taxation under section 501(a) if it has engaged in a prohibited transaction after July 1, 1950; and an organization described in section 401(a) which is subject to the provisions of this section shall not be exempt from taxation under section 501(a)↩ if it has engaged in a prohibited transaction after March 1, 1954.
6. Sec. 1.503(c)-1(b) [Income Tax Regs.] Loans as prohibited transactions under section 503(c)(1)--(1) Adequate security. For the purposes of section 503(c)(1), which treats as prohibited transactions certain loans by an organization without receipt of adequate security and a reasonable rate of interest, the term "adequate security" means something in addition to and supporting a promise to pay, which is so pledged to the organization that it may be sold, foreclosed upon, or otherwise disposed of in default of repayment of the loan, the value and liquidity of which security is such that it may reasonably be anticipated that loss of principal or interest will not result from the loan. Mortgages or liens on property, accommodation endorsements of those financially capable of meeting the indebtedness, and stock or securities issued by corporations other than the borrower may constitute security for a loan to the persons or organizations described in section 503(c). Stock of a borrowing corporation does not constitute adequate security. A borrower's evidence of indebtedness, irrespective of its name, is itself not security for a loan, whether or not it was issued directly to the exempt organization. However, if any such evidence of indebtedness provides for security that may be sold, foreclosed upon, or otherwise disposed of in default of repayment of the loan, there may be adequate security for such loan. If an organization subject to section 503(c) purchases debentures issued by a person specified in section 503(c), the purchase is considered, for purposes of section 503(c)(1), as a loan made by the purchaser to the issuer on the date of such purchase. For example, if an exempt organization subject to section 503(c) makes a purchase through a registered security exchange of debentures issued by a person described in section 503(c), and owned by an unknown third party, the purchase will be considered as a loan to the issuer by the purchaser. For rules relating to loan of funds to, or investment of funds in stock or securities of, persons described in section 503(c) by an organization described in section 401(a)↩, see paragraph(b)(5) of section 1.401-1. 7. We are aware that section 2003(c) of Pub. L. 93-406 provides as follows: P.L. 93-406, sec. 2003(a): Added Code Sec. 4975. Sec 2003(c), P.L. 93-406 provides as follows: "(c) Effective Date and Savings Provisions.-- "(1)(A) The amendments made by this section shall take effect on January 1, 1975. "(B) If, before the amendments made by this section take effect, an organization described in section 401(a) of the Internal Revenue Code of 1954 is denied exemption under section 501(a) of such Code by reason of section 503 of such Code, the denial of such exemption shall not apply if the disqualified person elects (in such manner and at such time as the Secretary or his delegate shall by regulations prescribe) to pay, with respect to the prohibited transaction (within the meaning of section 503(b) or (g)) which resulted in such denial of exemption, a tax in the amount and in the manner provided with respect to the tax imposed under section 4975 of such Code. An election made under this subparagraph, once made, shall be irrevocable. The Secretary of the Treasury or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this subparagraph. * * *" However, this fact does not detract from the clear intent of Congress that the funds of a pension or profit-sharing trust were not to, in effect, be borrowed on an unsecured indebtedness by its creator. If it were considered that "payment" to a pension or profit-sharing plan could be made by an unsecured note of its creator, the result would be merely permitting by subterfuge the borrowing of the corpus of the trust by its creator on an unsecured note.↩
8. SEC. 6081. EXTENSION OF TIME FOR FILING RETURNS. (a) General Rule.--The Secretary or his delegate may grant a reasonable extension of time for filing any return, declaration, statement, or other document required by this title or by regulations. Except in the case of taxpayers who are abroad, no such extension shall be for more than 6 months. (b) Automatic Extension for Corporation Income Tax Returns.--An extension of 3 months for the filing of the return of income taxes imposed by subtitle A shall be allowed any corporation if, in such manner and at such time as the Secretary or his delegate may by regulations prescribe, there is filed on behalf of such corporation the form prescribed by the Secretary or his delegate, and if such corporation pays, on or before the date prescribed for payment of the tax, the amount properly estimated as its tax or the first installment thereof required under section 6152; but this extension may be terminated at any time by the Secretary or his delegate by mailing to the taxpayer notice of such termination at least 10 days prior to the date for termination fixed in such notice.↩