T.C. Memo. 1998-443


UNITED STATES TAX COURT


MICHAEL MORRISSEY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 13074-97.                    Filed December 16, 1998.


        P borrowed money from the pension plans of his
wholly owned corporation.  On Oct. 19, 1990, when P
owed the plans principal and interest totaling
$1,150,000, he "repaid" this debt by transferring to
one of the plans his 50-percent interest in two parcels
of unencumbered real estate.  The market value of one
parcel was $628,000 on Sept. 23, 1991.  The market
value of the other parcel was $1.45 million on Nov. 9,
1991.
        <u>Held</u>: P's transfer of property to his plan was a
"sale or exchange" under sec. 4975(c)(1)(A), I.R.C.;
hence, it was a prohibited transaction under sec.
4975(a), I.R.C., that subjects P to the initial tax set
forth in sec. 4975(a), I.R.C.
        <u>Held</u>, <u>further</u>, The prohibited transaction was
never "corrected" within the meaning of sec. 4975(b),
I.R.C.; hence, P also is liable for the additional tax
set forth in sec. 4975(b), I.R.C.

Held, further, P is not liable for the additions to tax determined by R under sec. 6651(a)(1), I.R.C., for failure to file excise tax returns for 1990 through 1996; as of the respective due dates for these returns, a reasonable person could have concluded that the filing of an excise tax return was not required because the transfer was not a prohibited transaction, or, if it was, that it had been corrected.

Andrew I. Panken and Robert A. DeVellis, for petitioner.

Catherine R. Chastanet, for respondent.

## MEMORANDUM OPINION

LARO, Judge: The parties submitted this case to the Court without trial. See Rule 122. Petitioner petitioned the Court to redetermine respondent's determination of the following deficiencies in Federal excise tax and additions thereto:

| Year | First-tier (initial) deficiency Sec. 4975(a) | Second-tier (additional) deficiency Sec. 4975(b) | Additions to Tax Sec. 6651(a)(1) |
|------|------|------|------|
| 1990 | $9,584 | --- | $2,156 |
| 1991 | 57,500 | --- | 12,398 |
| 1992 | 57,500 | --- | 12,398 |
| 1993 | 57,500 | --- | 12,398 |
| 1994 | 57,500 | --- | 12,398 |
| 1995 | 57,500 | --- | 12,398 |
| 1996 | 57,500 | $1,150,000 | 12,398 |

We decide the following issues:

1. Whether petitioner's transfer of property to his pension plan was a prohibited transaction under section 4975(a). We hold it was.

2.   Whether the prohibited transaction was "corrected" within the meaning of section 4975(b).  We hold it was not.

3.   Whether petitioner is liable for the additions to tax determined by respondent under section 6651(a)(1) for failure to file Federal excise tax returns.  We hold he is not.

Unless otherwise noted, section references are to the applicable versions of the Internal Revenue Code.  Rule references are to the Tax Court Rules of Practice and Procedure. Dollar amounts are rounded to the nearest dollar.

## Background

Most facts are stipulated.  The stipulated facts and exhibits submitted therewith are incorporated herein by this reference.  Petitioner resided in Southampton, New York, when he petitioned the Court.  He is the president and secretary of Westchester Plastic Surgical Associates, P.C. (Westchester Associates), his wholly owned corporation.

Westchester Associates adopted a money purchase plan (the MPP) effective as of January 15, 1972, and it adopted a defined benefit pension plan (the DBP) effective as of November 1, 1976. Both plans (collectively, the Plans) received favorable determination letters from the Internal Revenue Service. Petitioner has been the only trustee of the trusts (the Trusts) associated with the Plans, and, as trustee, he has exercised control over the management and disposition of the Plans' assets.

The DBP ceased benefit accruals in 1990. When it did, the DBP had three participants, including petitioner, all of whom were 100 percent vested. Each of these participants, except for petitioner, was paid his or her benefits at that time. The DBP was formally terminated as of September 26, 1990.

The MPP was operational throughout its taxable year that ended on October 31, 1990. The MPP had two participants at the beginning and end of that year. Petitioner was one of these participants. The record does not identify the other participant.

From November 14, 1979, to February 17, 1989, the Plans made 23 loans to petitioner. Each of these loans, but one, was evidenced by a "promissory note" or an "installment note" signed by petitioner as the obligor.[1] As stated on the notes, the dates of the loans, the obligees, the original loan amounts, and the interest rates for these loans, some of which were unsecured and others of which were secured by petitioner's accounts in the Plans, were as follows:

---

[1] The record does not contain the signature page of one of the 22 notes. Given the fact that petitioner signed each of the other 21 notes, we find that he also signed the 22d note.

| Date Of loan | Obligee[1] | Original loan amount | Interest rate |
|---|---|---|---|
| 11/14/79 | MPPT | $4,500 | 12% |
| 05/01/81 | MPPT | 10,000 | 16 |
| 10/01/81 | MPPT | 10,000 | 16 |
| 01/04/82 | MPPT | 145,000 | 16 |
| 06/11/82 | MPPT | 7,000 | 16 |
| 08/02/82 | MPPT | 30,000 | 14 |
| 01/03/83 | MPPT | 60,000 | 11 |
| unstated | MPPT | 6,000 | 11 |
| 02/08/84 | Pension Plan | 13,000 | 11 |
| 01/08/85 | MPPT | 153,687 | 11 |
| 08/27/85 | Pension Plan | 50,000 | 12 |
| 09/17/85 | MPPT | 20,000 | 11 |
| 12/03/85 | Pension Trust | 5,500 | 10 |
| 01/03/86 | Pension | 14,500 | 10.50 |
| 04/15/86 | MPPT | 5,000 | 9 |
| 07/30/87 | MPPT | 50,000 | 9.50 |
| 10/08/87 | MPPT | 25,000 | 10 |
| 12/09/87 | MPPT | 25,000 | 9.75 |
| 02/01/88 | MPPT | 15,000 | unstated |
| 02/12/88 | BP Trust | 20,000 | 9.75 |
| 12/09/88 | Pension | 2,000 | 11.50 |
| 12/09/88 | MPPT | 8,000 | 11.50 |
| 02/17/89[2] | | 2,000 | 11.50 |
| Total | | 681,187 | |

[1] Each note references the obligee as "MPPT", "DBT Trust", "Pension Plan", "Pension Trust", or "Pension". We believe that "MPPT" and "DBP Trust" refer to the money purchase plan trust and the defined benefit plan trust, respectively, and we so find. We are unable to find which of the Trusts was the obligee where the note listed the obligee as "Pension Plan", "Pension Trust", or "Pension".

[2] The record does not contain a note for the loan that was made on Feb. 17, 1989. The parties have stipulated the information shown on this line.

None of the loan amounts was ever included in petitioner's gross income as a distribution.

On October 1, 1990, petitioner's obligations to repay the loans from the Plans totaled 100 percent of the Trusts' assets.[2] Eighteen days later, when petitioner owed the Plans

_____

[2] Most of the Trusts' assets consisted of assets held by the

(continued...)

$1,150,000 (consisting of principal of $681,187 and interest of $468,813), he transferred to the MPP his 50-percent interest in two parcels of unencumbered real estate sited in Southampton, New York.[3] Petitioner's former wife owned the remaining interests. One parcel had a market value of $628,000 on September 23, 1991. The other parcel had a market value of $1.45 million on November 9, 1991. The record does not disclose the market value of either parcel on any other date.

Petitioner has never filed a Form 5330, Return of Excise Taxes Related to Employee Benefit Plans, with respect to his transfer of the real estate to the MPP.

## Discussion

We decide first whether petitioner's transfer of the real estate to the MPP was a prohibited transaction under section 4975(a). Respondent determined it was, and, relying primarily on Commissioner v. Keystone Consol. Indus., Inc., 508 U.S. 152 (1993), argues to the same effect in this proceeding. Petitioner argues that the transfer was not a prohibited

---

[2](...continued)
money purchase plan trust. The DBP was terminated on Sept. 26, 1990, and its only asset on Oct. 1, 1990, was the right to receive repayment from petitioner for the amounts it lent him.

[3] Petitioner asserts in his brief that the real estate was transferred to both pension plans. The record does not support this assertion, and we decline to find it as a fact. See Rule 143(b). The record does not show that petitioner ever transferred any asset to the DBP in repayment of moneys that he borrowed from it.

transaction under section 4975(a). According to petitioner, the prohibited transaction rules do not apply to him because he was the only beneficiary of the Plans at the time of the transfer. If he is subject to these rules, petitioner asserts, the transfer was not a "sale or exchange" under the view of this Court as stated in Wood v. Commissioner, 95 T.C. 364 (1990), revd. 955 F.2d 908 (4th Cir. 1992), and Keystone Consol. Indus., Inc. v. Commissioner, T.C. Memo. 1990-628, affd. 951 F.2d 76 (5th Cir. 1992), revd. 508 U.S. 152 (1993). Petitioner recognizes that the Supreme Court disagreed with our view in Commissioner v. Keystone Consol. Indus., Inc., 508 U.S. 152 (1993), but asserts that the Court's decision there applied only to unencumbered property contributed in satisfaction of a funding obligation. Here, petitioner asserts, he transferred unencumbered property to repay a loan. Petitioner asserts that repaying the loan was more beneficial to the Plans than leaving it outstanding.

We disagree with petitioner's assertion that he is not subject to the prohibited transaction rules. Nor do we agree with his assertion that the transfer was not a prohibited transaction. We start our inquiry with the relevant text. See Calvert Anesthesia Associates-Pricha Phattiyakul, M.D., P.A. v. Commissioner, 110 T.C. 285, 289 (1998); Venture Funding, Ltd. v. Commissioner, 110 T.C. 236 (1998); Trans City

Life Ins. Co. v. Commissioner, 106 T.C. 274, 299 (1996); see also Garcia v. United States, 469 U.S. 70, 76 n.3 (1984).  This text is as follows:

SEC. 4975.  TAX ON PROHIBITED TRANSACTIONS.

(a)  Initial Taxes on Disqualified Person.-- There is hereby imposed a tax on each prohibited transaction.  The rate of tax shall be equal to 5 percent of the amount involved with respect to the prohibited transaction for each year (or part thereof) in the taxable period.  The tax imposed by this subsection shall be paid by any disqualified person who participates in the prohibited transaction (other than a fiduciary acting only as such).

(b)  Additional Taxes on Disqualified Person.-- In any case in which an initial tax is imposed by subsection (a) on a prohibited transaction and the transaction is not corrected within the taxable period, there is hereby imposed a tax equal to 100 percent of the amount involved.  The tax imposed by this subsection shall be paid by any disqualified person who participated in the prohibited transaction (other than a fiduciary acting only as such).

(c)  Prohibited Transaction.--

(1)  General rule.--For purposes of this section, the term "prohibited transaction" means any direct or indirect--

(A) sale or exchange * * * of any property between a plan and a disqualified person;

* * * * * * *

(e)  Definitions.--

(1)  Plan.--For purposes of this section, the term "plan" means a trust described in section 401(a) which forms a part of a plan, or a plan described in section 403(a), which trust or plan is exempt from tax under section 501(a), * * *

(2) Disqualified person.--For purposes of this section, the term "disqualified person" means a person who is—-

(A) a fiduciary;

\* \* \* \* \* \* \*

(3) Fiduciary.--For purposes of this section, the term "fiduciary" means any person who—-

(A) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

\* \* \* \* \* \* \*

(f) Other Definitions and Special Rules.--For purposes of this section—-

\* \* \* \* \* \* \*

(2) Taxable period.--The term "taxable period" means, with respect to any prohibited transaction, the period beginning with the date on which the prohibited transaction occurs and ending on the earliest of—-

(A) the date of mailing a notice of deficiency with respect to the tax imposed by subsection (a) under section 6212,

(B) the date on which the tax imposed by subsection (a) is assessed, or

(C) the date on which correction of the prohibited transaction is completed.

(3) Sale or exchange; encumbered property.--A transfer of real or personal property by a disqualified person to a plan shall be treated as a sale or exchange if the property is subject to a

mortgage or similar lien which the plan assumes or if it is subject to a mortgage or similar lien which a disqualified person placed on the property within the 10-year period ending on the date of the transfer.

(4) Amount involved.--The term "amount involved" means, with respect to a prohibited transaction, the greater of the amount of money and the fair market value of the other property given or the amount of money and the fair market value of the other property received; * * * For purposes of the preceding sentence, the fair market value—-

(A) in the case of the tax imposed by subsection (a), shall be determined as of the date on which the prohibited transaction occurs; and

(B) in the case of the tax imposed by subsection (b), shall be the highest fair market value during the taxable period.

(5) Correction.--The terms "correction" and "correct" mean, with respect to a prohibited transaction, undoing the transaction to the extent possible, but in any case placing the plan in a financial position not worse than that in which it would be if the disqualified person were acting under the highest fiduciary standards.

Section 4975 was added to the Code in 1974 by the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, sec. 2003(a), 88 Stat. 829, 971. See also Commissioner v. Keystone Consol. Indus., Inc., 508 U.S. at 160 (section 4975(c)(1)(A) contains "broad language"). The Congress enacted section 4975 to effectuate its intent to tax disqualified persons who engage in self-dealing rather than innocent employees who were previously faced with plan disqualification on account of a prohibited transaction. S. Rept. 93-383, at

94-95 (1973), 1974-3 C.B. (Supp.) 80, 173-174; see also Greenlee v. Commissioner, T.C. Memo. 1996-378. Disqualification penalized employee/plan participants in that they were denied favorable tax consequences such as deferral of taxation. S. Rept. 93-383, supra at 94, 1974-3 C.B. (Supp.) at 173; see also Hamlin Dev. Co. v. Commissioner, T.C. Memo. 1993-89, for a discussion of the favorable tax consequences that flow from a pension plan. The Congress' intent in enacting pension plan legislation has primarily been to protect participants and their beneficiaries by ensuring that plan assets are held for their exclusive benefit. H. Conf. Rept. 93-1280, at 303 (1974), 1974-3 C.B. 415, 464.

Petitioner does not contest respondent's determination that petitioner was a disqualified person under section 4975 on the date of the transfer. He was by virtue of his status as the Plans' trustee. See sec. 4975(e)(2)(A) and (3)(A). Nor does petitioner contest respondent's determination that each of the Trusts was a "plan" under section 4975(e)(1). Petitioner's dispute with respondent begins with petitioner's assertion that he is excepted from the prohibited transaction rules because, he contends, he was the only beneficiary of the Plans.

We disagree with petitioner that he is excepted from the prohibited transaction rules. He was not the MPP's only beneficiary when he transferred the real estate to it. Even if

he had been, in at least one prior case, a Court of Appeals has held a beneficiary of a one-person pension plan liable under section 4975. See <u>Wood v. Commissioner</u>, 955 F.2d 908 (4th Cir. 1992). Petitioner attempts to distinguish <u>Wood</u> by arguing that the issue there related to a satisfaction of a funding obligation, whereas here he transferred the real estate to the MPP in repayment of a loan.[4] We do not believe that this bare difference in fact leads to a different result. The repayment of a loan, like the honoring of a funding obligation, satisfies a debt owed by the transferor. We see no meaningful distinction that may be drawn from the fact that the obligation in one case stems from a borrowing, whereas the obligation in the other stems from a contractual promise to set aside a stated sum of money for the benefit of plan participants. In both cases, a transfer is made to satisfy an obligation. For present purposes, the former obligation is indistinguishable from the latter.

The Congress' goal in enacting section 4975 "was to bar categorically a transaction that was likely to injure the pension plan." <u>Commissioner v. Keystone Consol. Indus., Inc.</u>,

---

[4] Generally, any lending money between a plan and a disqualified person is a prohibited transaction. Sec. 4975(c)(1)(B). Sec. 4975(d)(1), however, carves out an exception in the case of certain loans that meet the criteria set forth therein. Respondent does not assert that petitioner's loans from the Plans were outside this exception.

508 U.S. at 160 (citing S. Rept. 93-383, supra at 95-96, 1974-3 C.B. (Supp.) at 174-175). Before ERISA, a transfer of property to a pension plan either to satisfy a funding obligation or to repay a loan presented the potential for abuse. The transferor could transfer nonliquid assets to the plan, or he or she could otherwise "sell" the assets to the plan at a price that was not indicative of their true worth. Id. By adding section 4975 to the Code, the Congress endeavored to bar any transfer of property in payment of a transferor's obligation to his or her plan. Id.

The type of abusive property transfer that the Congress was concerned about appears to be present in the instant case, where petitioner transferred a nonliquid asset to the MPP, and the transfer was most likely injurious to the MPP. The benefit that the MPP would have enjoyed from a cash repayment of the loan far exceeded any benefit that it received upon receipt of the property. The MPP and the DBP are separate entities, and the fact that petitioner transferred the real estate only to the MPP means that the MPP now owes him an amount equal to the real estate value that exceeded his debt to the MPP before the transfer. Following the transfer, the MPP had minimal assets, but for the real estate, and, in order to restore its position and satisfy its obligation to petitioner, the MPP was required to convert the real estate into cash. Such a conversion is

generally problematic and costly, especially in the instant setting where petitioner's 50-percent interest would most likely have had to be partitioned before it could be sold. To the extent that the excess value remained in the MPP, it would constitute an overfunding of the MPP, which, under basic principles of pension law, would have to be given back to the transferor to avoid plan termination. See sec. 1.415-9(a)(1), Income Tax Regs.; see also Buzzetta Constr. Corp. v. Commissioner, 92 T.C. 641 (1989). The mere fact that the value that petitioner transferred to the MPP may have equaled the amount that he owed both the Plans, a fact that petitioner asserts but which the record disproves, does not mean that both debts are satisfied as a result of the transfer. Indeed, it appears that petitioner continues to owe the DBP the money (with interest) that it lent to him because he has never transferred any value to the DBP to repay these amounts. The record suggests that petitioner attempted to satisfy his $1,150,000 obligation to the Plans by surrendering property of inadequate value. The property had been appraised at a total of $2,078,000 shortly after the transfer, and the record does not support a finding that petitioner's 50-percent interest in the property was worth more than $1,039,000 on the date of the transfer (i.e., 50% x $2,078,000). Of course, it would be an unusual case where petitioner's 50-percent undivided interest

actually equaled 50 percent of the value of the real estate in fee.

We also disagree with petitioner's assertion that his transfer to the MPP was not a "sale or exchange". In Commissioner v. Keystone Consol. Indus., Inc., 508 U.S. at 159, the Supreme Court faced an analogous issue with respect to property that had been transferred to satisfy an employer's obligation to fund a qualified defined benefit plan. In holding that the transfer was a sale or exchange subject to the rules of section 4975, the Court noted that the meaning of the term "sale or exchange" was well settled for income tax purposes to include any transfer of property in satisfaction of a monetary obligation. Id. at 158-159. The Court stated that the Congress' use of that term in section 4975 generally encompassed all "sales or exchanges", whether they be "direct or indirect". Id. at 159. The Court, by way of example, described a situation where a transfer of property to a plan was outside the reach of that term by virtue of an exception prescribed in section 4975(f)(3). The Court's example covered an employer who transferred unencumbered property to a plan, without satisfaction of an obligation to it. Id. at 161 n.2. As stated by the Court with respect thereto: "A transfer of encumbered property, like the transfer of unencumbered property to satisfy an obligation, has the potential to burden a plan,

while a transfer of property that is neither encumbered nor satisfies a debt presents far less potential for causing loss to the plan."  Id. at 162.

Contrary to petitioner's assertion, the Court's decision in Keystone governs our decision here.  Petitioner owed the Plans money which they had lent to him, and he transferred the real estate to the MPP in payment of his debt to it.  Under the Court's holding in Keystone, the fact that petitioner's transfer to the MPP was in repayment of his debt is enough to categorize the transfer as a "sale or exchange" for purposes of section 4975(c)(1)(A).  Petitioner's reliance on our decisions in Wood and Keystone to support a contrary result is misguided. As the Supreme Court recently stated:

> When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.  [Harper v. Virginia Dept. of Taxation, 509 U.S. 86, 97 (1993).]

On the basis of the Supreme Court's opinion in Commissioner v. Keystone Consol. Indus., Inc., 508 U.S. 152 (1993), we sustain respondent's determination that petitioner is liable for excise taxes under section 4975(a).

As to respondent's determination under section 4975(b), petitioner argues that this determination is wrong because "the tremendous appreciation in the subject real estate since the

date of transfer (October 19, 1990) made the transaction self-correcting * * *. See Zabolotny v. Commissioner, 7 F.3d 774 (8th Cir. 1993)", affg. in part and revg. in part 97 T.C. 385 (1991). Respondent argues that petitioner never corrected the transfer, and, to the extent that the Court of Appeals for the Eighth Circuit held in Zabolotny that a transaction could self-correct, this holding is wrong and should not be followed. Respondent asserts that we should follow our opinion in Zabolotny to the effect that a "correction" requires an affirmative act that undoes the transfer.

Contrary to the parties' assertion, we do not believe that our decision here is controlled by either opinion in Zabolotny. The facts of that case are significantly different than the facts at hand.[5] In Zabolotny v. Commissioner, 97 T.C. 385 (1991), the taxpayers, after discovering oil on their farmland, leased the mineral rights in the land. During the following 4-year period, the lease generated annual royalty income of approximately $1 million to $1.5 million. On May 20, 1981, approximately 4 years after the start of the lease, the taxpayers sold their interest in the land, including the lease,

---

[5] In fact, the Court of Appeals for the Eighth Circuit explicitly recognized the uniqueness of the facts in Zabolotny, stating: "The Zabolotnys have presented a highly unusual set of circumstances, which are unlikely to appear in combination in a single case". Zabolotny v. Commissioner, 7 F.3d at 774, 778 (8th Cir. 1993), affg. in part and revg. in part 97 T.C. 385 (1991).

to an employee stock ownership plan (ESOP) that benefited the employees of a corporation formed by the taxpayers to conduct their farming operation.  In return for the taxpayers' interest in the land, the ESOP agreed to pay the taxpayers a private annuity of $478,615 per year.

Respondent determined that the sale of the farmland to the ESOP was a prohibited transaction under section 4975(c)(1)(A) and that the taxpayers were liable for excise tax deficiencies under section 4975(a) and (b).  We agreed.  Zabolotny v. Commissioner, 97 T.C. at 399.  We held in relevant part that: (1) The sale was a prohibited transaction, and (2) this transaction was not "corrected", even if the transaction had been favorable to the ESOP from the start.  Id.  We reasoned that a "correction" occurs when the transaction is rescinded through an affirmative act.  Id.

Upon appeal, the Court of Appeals for the Eighth Circuit agreed with us only as to the first issue; to wit, that the transaction was a prohibited transaction.  Zabolotny v. Commissioner, 7 F.3d at 777.  As to the second issue, the Court of Appeals held that a correction may occur absent an affirmative act of rescission.  Id. at 777-778.  The court found that the transaction in Zabolotny corrected itself at the end of 1981 because, at that time, the ESOP was in exceptional financial condition and no plan beneficiary risked losing plan

benefits as a result of the prohibited transaction.  Id.  The court noted that:  (1) The taxpayers were both the disqualified persons and the ESOP's sole beneficiaries, (2) the prohibited transaction proved highly productive for the ESOP from the beginning, leaving it with assets of far greater value than it would have accumulated from employer contributions alone, and (3) the ESOP purchased extraordinarily valuable property that had a 4-year history of producing royalties in the millions of dollars.  Id.

In contrast with Zabolotny, we are unable to find here that the Plans were in exceptional financial condition, or that a plan beneficiary did not risk losing plan benefits, as a result of the prohibited transaction.  Unlike the transfer in Zabolotny, which left the plan with assets of far greater value than it would have accumulated from employer contributions alone, the transfer here did not increase the assets held by the Plans.  The transfer replaced one asset (an account receivable) with another asset (real estate), and the asset received by the MPP needed to be sold by it to satisfy its obligation to petitioner (thus resulting in additional plan expenditures).  The Plans also did not receive extraordinarily valuable property that had a solid history of producing income in the millions of dollars, nor did the prohibited transaction prove highly productive for the Plans from the start.

Petitioner, the disqualified person, also was not the MPP's sole beneficiary. Because the MPP was not "in a financial position not worse than that in which it would be if the disqualified person were acting under the highest fiduciary standards", see sec. 4975(f)(5), we sustain respondent's determination that petitioner is liable for the second-tier excise tax under section 4975(b). In so doing, we note that sections 4961(a) and 4963(e)(1) generally allow for the abatement of a section 4975(b) second-tier tax if the prohibited transaction giving rise thereto is corrected within 90 days after our decision sustaining the tax becomes final. Because the issue of whether petitioner will or would qualify for an abatement is not yet ripe for decision, we express no opinion on this issue at this time.

Turning to the additions to tax determined by respondent under section 6651(a)(1), petitioner argues that these additions do not apply because the law governing a transfer of property to a pension plan in repayment of a loan was uncertain when he transferred the real estate to the MPP, and it is still uncertain today. Respondent agrees that the law governing a transfer of property to a pension plan was uncertain before Commissioner v. Keystone Consol. Indus., Inc., 508 U.S. 152 (1993), but points out that the Commissioner, in recognition of this uncertainty, published rules under which taxpayers could

avoid the additions to tax under section 6651(a)(1) and (2).
Respondent argues that petitioner is liable for the additions
to tax at issue because he failed to follow these rules, and he
failed otherwise to exercise ordinary business care and
prudence.

We hold that petitioner is not liable for the additions to
tax.  Again, we start our inquiry with the relevant text:

SEC. 6651.  FAILURE TO FILE TAX RETURN OR TO PAY TAX.

> (a)  Additions to the Tax.--In case of failure--
>
> > (1) to file any return required under
> > authority of subchapter A of chapter 61
> > (other than part III thereof) * * * on the
> > date prescribed therefor (determined with
> > regard to any extension of time for
> > filing), unless it is shown that such
> > failure is due to reasonable cause and not
> > due to willful neglect, there shall be
> > added to the amount required to be shown as
> > tax on such return 5 percent of the amount
> > of such tax if the failure is for not more
> > than 1 month, with an additional 5 percent
> > for each additional month or fraction
> > thereof during which such failure
> > continues, not exceeding 25 percent in the
> > aggregate * * *

From this text, we understand that a taxpayer who is
required to file an excise tax return, but who does not do so
timely, is generally liable for a monthly addition to tax equal
to 5 percent of the amount of tax that should have been shown
on the return, up to a maximum charge of 25 percent.  See also
Janpol v. Commissioner, 102 T.C. 499, 500 (1994).  We also
understand that the addition to tax does not apply where the

failure to file was due to reasonable cause and not due to willful neglect.  See also United States v. Boyle, 469 U.S. 241, 245 (1985); Janpol v. Commissioner, supra at 504. Reasonable cause is present where the taxpayer exercised ordinary business care and prudence but was unable to file the return within the prescribed time.  United States v. Boyle, supra at 245; sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Willful neglect means a conscious, intentional failure or reckless indifference.  United States v. Boyle, supra at 245. Whether a taxpayer acts with reasonable cause, and without willful neglect, is decided on the basis of the entire record. Estate of Duttenhofer v. Commissioner, 49 T.C. 200, 204 (1967), affd. 410 F.2d 302 (6th Cir. 1969).

A disqualified person who engages in a prohibited transaction is required to file an excise tax return for each taxable year in the taxable period.  Secs. 4975(f)(2), 6011; sec. 54.6011-1(b), Pension Excise Tax Regs.; see also Janpol v. Commissioner, supra at 500.  Because petitioner was a disqualified person who engaged in a prohibited transaction on October 19, 1990, and the transaction remained uncorrected upon issuance of the notice of deficiency, he was required to file an excise tax return for 1990 and for each taxable year thereafter up to and including 1996.  See sec. 4975(f)(2) (absent a prior correction or a prior assessment of excise tax

on a prohibited transaction, the taxable period ends upon issuance of a notice of deficiency).  Petitioner did not file an excise tax return for any of these years.

With respect to the excise tax returns which were due for 1990 and 1991, we believe that petitioner's failure to file these returns was reasonable.  The Supreme Court had not yet decided Keystone by the due dates for these returns; i.e., July 31, 1991 and 1992, respectively.  See sec. 54.6011-1(b), Pension Excise Tax Regs.; see also Instructions to Form 5330, at 2 ("For taxes due under sections * * * 4975 * * *, file Form 5330 by the last day of the 7th month after the end of the tax year of the employer or other person who must file this return.").  Although Keystone later became the law that we apply herein, we do not impute the knowledge of this law to petitioner with respect to 1990 and 1991.  Reasonable cause and the absence of willful neglect are gauged at the time that a return is due, and we bear in mind only the information that the taxpayer knew (or could have known) on that date.  See Ellwest Stereo Theatres, Inc. v. Commissioner, T.C. Memo. 1995-610; see also Industrial Indem. v. Snyder, 54 AFTR 2d 84-5127, 84-1 USTC par. 9507 (E.D. Wash. 1984).  The mere fact that an individual never files a return for a given year does not necessarily mean that he or she is liable under section 6651(a)(1) for an addition to that year's tax.  Although

a predecessor of section 6651(a)(1) provided explicitly that reasonable cause could not be present where, as is the case here, the taxpayer never filed a return, see Revenue Act of 1928, ch. 852, sec. 291, 45 Stat. 857,[6] section 406 of the Revenue Act of 1935, ch. 829, 49 Stat. 1027, removed the prerequisite of a return for a finding of reasonable cause, and it ceases to be a prerequisite today, see sec. 6651(a)(1); see also Bowlen v. Commissioner, 4 T.C. 486, 494 (1944); Estate of Kirchner v. Commissioner, 46 B.T.A. 578 (1942).

The knowledge that we do impute to petitioner with respect to 1990 and 1991 is that this Court had held twice before July 31, 1991, that a transfer of unencumbered property to a pension plan in satisfaction of a funding obligation was not reportable on a Federal excise tax return. Although the Court of Appeals for the Fourth Circuit reversed one of these decisions before July 31, 1992, see Wood v. Commissioner, 955 F.2d 908 (4th Cir. 1992), the Court of Appeals for the Fifth Circuit affirmed the other decision 2 months before that

---

[6] Sec. 291 of the Revenue Act of 1928, ch. 852, 45 Stat. 857, provides:

> In case of any failure to make and file a return required by this title, within the time prescribed by law * * *, 25 per centum of the tax shall be added to the tax, except that when a return is filed after such time and it is shown that the failure to file it was due to reasonable cause and not due to willful neglect no such addition shall be made to the tax.* * *

reversal, see <u>Keystone Consol. Indus., Inc. v. Commissioner</u>, 951 F.2d 76 (5th Cir. 1992). With the state of the law as such on the due dates of the 1990 and 1991 returns, we believe that petitioner had reasonable cause for failing to file those returns. Although the Commissioner, 2 years after the Supreme Court's holding in <u>Keystone</u>, generally reminded taxpayers that they needed to file excise tax returns for all transfers of property to their pension plans and provided rules under which the Government would not impose additions to tax for failing to file these returns timely, see Announcement 95-14, 1995-8 I.R.B. 47, we are unable to conclude that this announcement had any bearing on additions to tax relating to returns which were due before the date on which the announcement was published. We repeat, for emphasis, that reasonable cause and the absence of willful neglect must be gauged at the time that a return is due, and the fact that a reasonable person may learn after that time that his or her position is incorrect does not mean that the position was unreasonable on the due date. See <u>Ellwest Stereo Theatres, Inc. v. Commissioner</u>, <u>supra</u>; see also <u>Industrial Indem. v. Snyder</u>, <u>supra</u>.

As to the remaining years, i.e., 1992 through 1996, we also do not believe that it was unreasonable for petitioner to have failed to file excise tax returns. On the basis of the state of the law on the relevant filing dates, a reasonable

person in petitioner's shoes could have concluded that excise tax returns were not required for those years.  The law governing a transfer of unencumbered property to a pension plan in satisfaction of a loan was, up until today, not squarely addressed by a court, and we believe that a reasonable person could have concluded on the basis of existing case law that an excise tax return was not required in such a situation.  We also take into account <u>Zabolotny</u> and the issue of whether a prohibited transaction can correct itself absent an affirmative act of rescission.  Although we held in that case that the prohibited transaction could not correct itself without rescission, our decision was reversed upon appeal.  The Court of Appeals concluded that section 4975 applied only to the first year in issue because the transaction self-corrected.

We conclude that a reasonable person in the position of petitioner as of the respective due dates of the 1992 through 1996 excise tax returns could have concluded that the relevant transfer was not a prohibited transaction, or, if it was, that it had been corrected earlier.

We have carefully considered all remaining arguments made by the parties for holdings contrary to those expressed herein, and, to the extent not discussed above, find them to be irrelevant or without merit.

To reflect the foregoing,

<u>Decision will be entered for respondent as to the deficiencies and for petitioner as to the additions to tax</u>.